68 N.J. Super. 118 (1961)
172 A.2d 47
JACK GRUBER ET AL., PLAINTIFFS,
v.
THE MAYOR AND TOWNSHIP COMMITTEE OF THE TOWNSHIP OF RARITAN ET AL., DEFENDANTS.
Superior Court of New Jersey, Law Division.
Decided May 9, 1961.
*120 Messrs. Parsons, Canzona, Blair and Warren, attorneys for plaintiffs (Mr. William R. Blair, Jr., appearing).
Messrs. Roberts, Pillsbury and Carton, attorneys for defendants (Mr. Lawrence A. Carton, Jr., appearing).
KNIGHT, J.S.C.
Two separate suits in lieu of prerogative writs were instituted by the plaintiffs, Raritan Associates, a partnership holding legal title to the tract of land in question, and Mestal Estates, a corporation of the State *121 of New Jersey and purchaser under a contract of sale of a portion of the property, which were consolidated for trial at the pretrial conferences. In the actions plaintiffs seek to set aside an amendment to the zoning ordinance of the Township of Raritan which changed the classification of plaintiffs' land from residential to light industrial, and excluded any residential use. Plaintiffs contend that the amendment is arbitrary and unreasonable and contrary to the zoning purposes expressed in R.S. 40:55-32. Alternatively, they contend that if the amendment is valid they had acquired vested rights in the use of the property in question for residential purposes prior to the passage of the amendment. They also seek to compel the approval of certain subdivision maps and the issuance of certain building permits and certificates of occupancy.
During the years of 1956 and 1957 the Zee Essex Realty Corporation, for the purpose of residential development, assembled the various parcels of land that became the tract in question. This tract contains approximately 130 acres of a triangular piece of land pointing toward the north totaling some 157 acres. The area is bounded on the east by the Garden State Parkway. The base of the triangle is bounded on the south by Bethany Road, which forms the boundary line between Raritan Township and Holmdel Township. The other leg of the triangle, on the west, is bounded by Line Road, the boundary line between Raritan Township and Matawan Township.
In furtherance of the development scheme, subdivision plats were prepared by Craig Finnegan, a licensed engineer and surveyor. (Mr. Finnegan, now deceased, was also the Township Engineer.) The tract was divided into five sections with a separate subdivision map for each section. The subdivision plats of sections one, two and three were submitted to the Township Committee for approval, and on July 26, 1956 resolutions were adopted approving them for filing purposes only, although the street layout and lot subdivision were also approved. However, approval was conditional *122 upon the execution of a performance agreement with the township, the construction of a sewage disposal plant, and the filing of the maps within one year.
On August 23, 1956 an agreement secured by a performance bond was entered into between Raritan Township and the Raritan Ridge Corporation (apparently a purchaser under a contract of sale, since there is a conflict in the testimony as to whether Raritan Ridge ever had legal title), relating to the development of section one, which provided for an irrevocable dedication of all streets shown on the map of section one, for the grading and surfacing of the streets, and set a final completion date of May 1, 1958. This agreement has never been performed.
On October 1, 1956 the township adopted an ordinance regulating land subdivision and creating a planning board. The effective date of the ordinance was October 2, 1956. On November 12, 1956, however, the township amended the ordinance and suspended its effective date until December 12, 1956, for the purpose of permitting the adoption of resolutions approving sections four and five under the same terms and conditions as sections one, two and three, with the exception that the maps were to be filed by December 7, 1957. The resolutions were adopted on December 7, 1956.
In July, 1957 the Township Committee adopted a resolution extending the time for entering into performance agreements on sections two and three and also extending the time for filing the maps of sections one, two and three until August 7, 1957. On August 7, 1957, by resolution, a further extension was granted until November 1, 1957. On October 31, 1957, the agreements relating to sections two and three were signed by the proper officials of the township and the Zee Essex Realty Corporation, and the maps were filed. Subsequently, on November 14, 1957, the Township Committee adopted a resolution extending the time for the filing of the maps of sections four and five for a period of two years until December 7, 1959. The first zoning ordinance passed by the township was on July 14, 1958, and by *123 the terms of that ordinance the plaintiffs' land was classified for residential use and remained in such classification until the passage of the amendment of November 23, 1959, now under attack.

THE VALIDITY OF THE NOVEMBER 23, 1959, ZONING AMENDMENT.
Raritan Township covers an area of some five and one-half square miles and is located in Monmouth County. In 1950 the population of the township was 2,763. It was at that time essentially a rural community with scattered clusters of homes and a few commercial establishments. Much of the land area was vacant or devoted to agricultural uses. However, with the advent of the Garden State Parkway in 1954, which runs through Raritan Township, its character changed rapidly. By 1960 the population had exploded to 15,287, with the greatest increase occurring after 1958. This influx created a need for greatly expanded municipal services of all types, particularly school facilities. Currently Raritan Township is running double sessions in all grade schools and has no high school facilities.
Mr. Herbert Smith, zoning and planning consultant for Raritan Township, testified that at present there are 49 classrooms in the township with a maximum capacity of 1,845 pupils, but as of January 31, 1960 the total pupil enrollment was 2,560, necessitating the double sessions. He estimated that by 1964 or 1965 the enrollment from kindergarten through eighth grade would increase by another 2,600 pupils, and to return to single session by such time the municipality will require 113 new classrooms. (Provided the tract in question remains in an industrial zone) To remain on double session 44 additional classrooms will be needed.
In the spring of 1959 the Planning Board, after conferring with Community Planning Associates, a professional planning consultant firm retained by the township, *124 determined that there was a need for an additional industrial zone, due to the extraordinary increase in population, the severe financial crisis facing the township, and the school problem.
The decision of the Planning Board was prompted by a desire to create a better economic balance in the township. It was felt that industrial development would create higher tax revenue than residential development in any given area, reducing the heavy tax burden placed on the home owner, and, additionally, industry would require less in the way of municipal services, particularly school facilities.
In searching for the proper area to rezone it was decided that the best available location would be the 157-acre tract located on the westerly side of the Parkway, since it is separated from the remainder of the township by the Garden State Parkway, which forms a natural buffer zone, ideal from the planning standpoint, and is in a good location for purposes of transportation. State Highways No. 34 and No. 35 are in close proximity to the tract, and a Parkway exit is only a quarter of a mile away. Also the secondary arteries, Line Road and Bethany Road, furnish ingress and egress from the tract to the Parkway and State Highways No. 34 and No. 35.
On August 19, 1959, after extended discussion and study, the Planning Board recommended to the Township Committee rezoning the entire tract in question as exclusively light industrial. After further study and discussion the Township Committee amended the zoning ordinance on November 23, 1959, in accordance with the recommendations of the Planning Board.
Plaintiffs contend that no changes have taken place which would warrant imposing new use restrictions on their property. They argue that no consideration was given to the suitability of the land for particular uses and that the highest and best use of the land would be for residential purposes. They further contend that restricting the tract to industrial purposes deprives the plaintiffs of the use of *125 their land since there is no demand for industrial property at present, or in the foreseeable future; that the secondary roads which would be used by industry are inadequate for industrial use; and the tract itself and the surrounding area are mainly devoted to agricultural and residential uses.
Plaintiffs' zoning and planning expert, Mr. Stephen Sussna, testified that in his opinion the tract was unsuitable for industrial use and that the best and proper use would be residential. His conclusion was based on several factors: namely, that the secondary roads, primarily Line Road and Bethany Road, were wholly inadequate for industrial use in their present condition; that improvement would require expensive and extensive condemnation proceedings seriously affecting roadside property; that water facilities were inadequate for industrial purposes; that industrial development would have a detrimental effect on nearby residential areas, particularly along Bethany Road east to Route No. 35, and would create serious traffic and safety hazards. He also testified that the Garden State Parkway would not serve as an adequate buffer due to the variety of permitted industrial uses under the ordinance.
Plaintiffs also called Mr. Max Neuberger, a real estate appraiser and mortgage broker, who testified that limiting the area to industrial use would adversely affect the value of the property, and the best use of the property would be residential.
Plaintiff also sought to establish the arbitrariness of the municipal action by eliciting testimony from the various township officials that the primary concern in rezoning the tract was the school problem.
Herbert Smith, the defendant's zoning and planning expert, testified that regardless of whether the tract was devoted to industrial or residential use the existing road facilities were inadequate with respect to Line Road and Bethany Road, however provisions for improvement of these roads had been included in projected municipal financing. Mr. Smith also testified at great length concerning the necessity *126 for the zoning amendment of November 23, 1959, in view of the imbalance within the community. It was his opinion that such measures were required in order to provide Raritan Township with a sound financial structure.
To refute the testimony of Mr. Neuberger, defendants called Mr. John Lazarus, a Monmouth County realtor. He testified that in his opinion the tract would be valuable for industrial development. Mr. Lazarus cited instances of industry's recently locating in adjacent Holmdel Township.
Plaintiffs urge that the use of the zoning power to aid in the solution of the school problem is improper and not within the purview of R.S. 40:55-32. Reliance is placed upon DeMott Homes at Salem, Inc. v. Margate City, 136 N.J.L. 330 (Sup. Ct. 1947), affirmed 136 N.J.L. 639 (E. & A. 1947); Ridgefield Terrace Realty Co. v. Borough of Ridgefield, 136 N.J.L. 311 (Sup. Ct. 1947). However, in Ward v. Montgomery Tp., 28 N.J. 529 (1959), where a zoning amendment was attacked as based solely on the desire of the municipality for tax revenue, the court held:
"* * * Manifestly, its fiscal picture was such that a new source of income would serve the general economic welfare. Pursuit of that objective was entirely worthy of the attention of the municipal fathers. And its achievement through land use regulation will not warrant judicial condemnation as long as it represents an otherwise valid exercise of the statutory zoning authority. If the amendment of the ordinance is compatible with and furthers a legitimate comprehensive plan for the zoning of the municipality within the contemplation of the statute, N.J.S.A. 40:55-32, it is legally unobjectionable. The fact that increased tax revenue is intended to result therefrom, or that an individual property owner may be benefited incidentally does not justify a charge of perversion of power. Kozesnik v. Montgomery Twp., supra; Collins v. Board of Adjustment of Margate City, 3 N.J. 200 (1949); Rockaway Estates v. Rockaway Tp., 38 N.J. Super. 468 (App. Div. 1955); Greenway Homes v. Borough of River Edge, 137 N.J.L. 453, 456 (Sup. Ct. 1948)." at pp. 535-536.
Thus, the fact that a primary concern of the governing body was the need for relieving the school problem does not vitiate the ordinance if it is otherwise consistent with *127 a comprehensive scheme or plan. Further, one of the enumerated purposes of zoning is to prevent the undue concentration of population. It is reasonable to assume that in this respect the Legislature had in mind the increased burden on school facilities resulting from population concentration. In Josephs v. Town Board of Town of Clarkstown, 24 Misc.2d 366, 198 N.Y.S.2d 695 (Sup. Ct. 1960), the plaintiff sought to erect homes on lots of 22,500 square feet in a zone requiring 40,000-square-foot lots. A municipal ordinance provided for the granting of special permits to allow such a development. The petition was denied by the governing body on the grounds that existing school facilities were inadequate to provide for the influx of children which would result from the larger number of homes.
In upholding the action taken by the municipality the court stated:
"It is all very well to speak generally of an absolute duty on the part of a municipality to supply necessary school, highway and other facilities as it grows and expands in population and as the need for increased facilities arises, but it is clear that the duty of the municipality in this regard will not bar it from the right to reasonably regulate and control the density of population in specified districts in the interest of public welfare and to avoid unnecessary hardship to individuals and taxpayers."

* * * * * * * *
"Now, incidental to the evils of overcrowding and undue concentration of population are generally the lack of proper school and educational facilities. The extent of future needs on account of such facilities and plans therefor are matters relative to and of important consideration in connection with zoning." 198 N.Y.S.2d, at p. 699.
The validity of the New York court's conclusions are persuasive in this case. The use of the zoning power to prevent the breakdown of educational facilities due to an overconcentration of population is a proper one.
Further, there can be no doubt but that providing for a balance between industry and residential development which alleviates excessive burdens and strains upon municipal *128 facilities and services promotes the general welfare of the community. Ward v. Montgomery Tp., 28 N.J. 529 (1959).
Plaintiffs further allege that the municipality must show a change in conditions to warrant reclassifying an area as to use, citing Borough of Cresskill v. Borough of Dumont, 15 N.J. 238 (1954), Farmer v. Meeker, 63 N.J. Super. 56 (Law Div. 1960). However, the correct rule is that expressed in S & L Associates v. Washington Tp., 61 N.J. Super. 312, 327 (App. Div. 1960). "As in the case of the original ordinance, the validity of an amendment is tested by the criterion of its reasonable adherence to the statutory purposes of zoning. A change in conditions is merely prima facie evidence that a zoning amendment is warranted."
The cases relied upon by plaintiffs are not to the contrary, but merely support the rule that changed conditions are relevant to the validity of a zoning amendment.
Further, there is ample evidence that there were drastic changes in the community as a whole between the time of the original proposal for residential development in 1956 and the rezoning in 1959. It is clear that the real pressures upon the municipality occurred after 1956. Zoning regulations are to be formulated with regard to encouraging the most appropriate use of the land throughout the municipality. Cobble Close Farm v. Middletown Tp. Board of Adjustment, 10 N.J. 442, 452 (1952); S & L Associates, Inc. v. Washington Tp., 61 N.J. Super. 312, 323 (App. Div. 1960).
Changes in conditions throughout the community are as relevant in establishing the validity of a zoning amendment as changes occurring only in the vicinity of the area rezoned.
The remaining inquiry is whether the amendment was in accordance with a comprehensive plan. That the rezoning was preceded by a rational process of deliberation cannot be disputed. The plan was considered over a period of some six months. Professional planning advice was *129 utilized. Public meetings were held and interested parties were given the opportunity to be heard before the ultimate decision was made.
Considering all of the evidence, in this court's opinion the rezoning was in keeping with a comprehensive plan in the best interests of zoning. Defendants' zoning expert, Mr. Herbert Smith, presented cogent and convincing arguments concerning the desirability of utilizing this particular tract for industrial use, and he demonstrated by the use of various graphs and charts which were placed in evidence that he had made a thorough examination and study of the problems facing Raritan Township. His testimony is deserving of great weight.
Finally it must be stated that the action of the municipality is presumptively valid and the judicial role in reviewing a zoning ordinance is limited to preventing arbitrary and unreasonable action by municipal officials. Socony Mobil Oil Co. v. Ocean Township, 56 N.J. Super. 310 (Law Div. 1959), affirmed 59 N.J. Super. 4 (App. Div. 1960); Pierro v. Baxendale, 20 N.J. 17 (1955); Kozesnik v. Montgomery Township, 24 N.J. 154, 167 (1957).
R.S. 40:55-32 establishes the standards by which a zoning ordinance must be measured and, as long as the municipal officials act with regard to one or more of the statutory purposes, the court will not substitute its judgment for that of the governing body. As long as action is taken in good faith, and in compliance with the statutory requisites, it will be upheld, even where the wisdom of such action appears debatable. Fanale v. Borough of Hasbrouck Heights, 26 N.J. 320 (1958); Ward v. Montgomery Township, 28 N.J. 529 (1959).
The plaintiffs have failed to establish the invalidity of the amendment of November 29, 1959.

THE CLAIM OF VESTED RIGHTS
Plaintiffs contend, alternatively, that the defendant is estopped from enforcing the provisions of the amended zoning *130 ordinance and, further, that they have acquired vested rights because of the following transactions performed by themselves or their predecessors in title after the performance agreements entered into with the municipality: the construction of four model homes; the installation of some curbing and the cutting of various streets in section one; their attempts to secure federal financing; the signing of a contract for the construction of a sewage disposal plant; and other moneys spent prior to actual construction.
The validity of this contention depends upon the answer to the following question: Was the action of the Mayor and Council in conditionally approving the plats in question ultra vires without the adoption of the provisions of N.J.S.A. 40:55-1.1 et seq. establishing a planning board to regulate subdivision approval?
In Magnolia Development Co., Inc. v. Coles, 10 N.J. 223 (1952), plaintiff presented to the Borough Council maps of two tracts for development. These maps were approved. Upon a later dispute involving drainage and related problems the defendant borough attempted to gain concessions from the plaintiff by refusing approval of a map of a third tract because of the earlier dispute and passed an ordinance requiring performance bonds on sidewalk and curbing improvements before approval of subdivision maps would be granted. Chief Justice Vanderbilt held the municipality was without power to exact such conditions except by means of adopting the procedures of then N.J.S.A. 40:55-1 et seq. (Now N.J.S.A. 40:55-1.1 et seq.)
"The defendant municipality has sought to exercise powers accorded to it under these statutes [N.J.S.A. 40:55-1 and 40:56-1 et seq.] without resorting to them and without giving taxpayers the protection they are afforded thereby. This it cannot do." 10 N.J., at p. 228.
Reid Development Corp. v. Parsippany-Troy Hills Tp., 10 N.J. 229 (1952), is to the same effect as the Magnolia case. In Reid Justice Heher, speaking for a unanimous *131 court, held that a municipality could not coerce an owner of property into upgrading his lots by withholding the extension of water mains which the developer was entitled to.
"(I)t was an abuse of discretion to use the grant [of water facilities] as a means of coercing the landowner into acceptance of the minimum lot-size restriction upon his lands, however serviceable to the common good. Such benefits are to be had through the channels prescribed by law. * * * [Citing Magnolia] There is no statutory authority for this condition. Planning and zoning powers may not be exerted by indirection; the exercise of these functions must needs be in keeping with the principles of the enabling statutes." 10 N.J., at p. 238.
Further evidence of the acceptance of the rule stated in Magnolia can be found in Borough of Oakland v. Roth, 25 N.J. Super. 32 (Ch. Div. 1953), affirmed sub. nom. Oakland Borough v. Roth, 28 N.J. Super. 321 (App. Div. 1953).
Even stronger evidence of such a requirement can be found in City of Rahway v. Raritan Homes, Inc., 21 N.J. Super. 541 (App. Div. 1952). There the court held that plaintiff could not attempt to impose the sanctions of R.S. 40:55-15 upon a subdivider of property where the plaintiff had not established a planning board or adopted regulations governing land subdivision. See also City of Newark v. Padula, 26 N.J. Super. 251 (App. Div. 1953). Contra, see Angermeier v. Borough of Sea Girt, 27 N.J. 298 (1958). There plaintiff filed an action in lieu of prerogative writ to require the municipality to recognize a lot subdivision. There also the defendant had not established a planning board under the authority of N.J.S.A. 40:55-1 et seq., but provided in the zoning ordinance that no plat would be "rearranged" without the permission of the Mayor and Council. Plaintiffs' attack was directly on the point that such regulation could not be done by means of the zoning ordinance, and that subdivision regulation is a part of planning, not zoning.
*132 Justice Heher first held that the Municipal Planning Act is optional or permissive, and not mandatory, then went on to hold that,
"`Subdivision' in the regulation of land use pursuant to the constitutional and statutory zoning policy is not subject to the planning act, where, as here, its provisions have not been invoked by the local legislative authority in the manner ordained in the Act." 27 N.J., at pp. 310-311.
The applicability of the Angermeier rule to the present case seems doubtful. The facts involved in Angermeier are vastly different from those present in Magnolia Development Co. v. Coles, supra, and the case at hand. The Borough of Sea Girt, the defendant in the Angermeier case, was a small community with a population of less than 2,000. It was at that time almost completely developed with few vacant lots and the borough had been completely laid out and divided into lots. Further, in Angermeier the attempted subdivision, if it were accomplished, would have resulted in a violation of the municipality's zoning ordinance. Angermeier v. Borough of Sea Girt, supra, 27 N.J., at p. 301. Finally, in Angermeier no attempt was made to require improvements to be made as a condition of subdivision approval.
Here we are faced with an attempt to coerce the builder in making local improvements and there is no indication that subdivision would have resulted in a zoning violation. Thus the rule stated in Magnolia Development Co. v. Coles, supra, is controlling.
There is evidence that the Supreme Court continues to accept the Magnolia rule. In Swimming River Golf & Country Club v. Borough of New Shrewsbury, 30 N.J. 132, 135 (1959), the Supreme Court approved a statement of the trial judge that "the exercise of zoning and planning processes must conform to the constitutional regulation and the enabling statutes."
For the above reasons it would appear that the rule still is as stated by the Magnolia case a municipality has no *133 power to regulate land subdivision without adopting the provision of the state enabling act.
Further, in the instant case the Township Committee continued to attempt to regulate the subdivision in question after December 12, 1956, on which date Raritan Township adopted a land subdivision ordinance establishing a planning board. In July 1957 the Township Committee passed a resolution extending the time which the plaintiff had to enter performance agreements on sections one, two and three, and also extending the time for filing the plats of sections one, two and three with the Monmouth County Planning Board. On August 7, 1957 a further extension was given until November 1957. And on November 14, 1957 a resolution was adopted extending for a period of two years the time for the filing of maps of sections four and five. All of the foregoing resolutions were in conflict with the procedures established by the land subdivision ordinance. Clearly, where a municipality has adopted the provisions of the Planning Act, subdivision control thereafter may be channeled only through the avenues provided by law, and any attempt to circumvent those avenues is illegal and ultra vires. Magnolia Development Co., Inc. v. Coles, 10 N.J. 223 (1952).
Therefore, the action of the municipality in regulating the plaintiffs' proposed subdivision is ultra vires and void and the agreements relating thereto are of no effect. Where the action of a municipality is void as being without the power of the municipal corporation as distinguished from acts which are ultra vires for want of proper authorization or execution, there can be no doctrine of estoppel applied against the municipality. See Vogt v. Borough of Belmar, 14 N.J. 195, 205 (1954).
"In respect of matters within the realm of its general power and authority, a municipal corporation is ordinarily subject to the doctrine of estoppel in pais to serve the demands of right reason and justice, at least where the invocation of the rule would not hinder *134 or prejudice essential governmental functions, and especially where the irregularity or deficiency is largely technical or formal and not of the jurisdiction." (Emphasis added)
See also Potter v. Borough of Metuchen, 108 N.J.L. 447 (Sup. Ct. 1931); 10 McQuillin, Municipal Corporations § 29, p. 104 (1950).
The acts of the municipal officials being illegal and ultra vires, plaintiffs may not gain any benefits from them and any expenditures made in reliance on such acts cannot be used as the basis for establishing vested rights. The statement made by Judge Conford in Hilton Acres v. Klein, 64 N.J. Super. 281, 296-297 (App. Div. 1960), applies with even greater force under the facts in the case at bar. Here plaintiffs seek to establish vested rights because of reliance on ultra vires acts to allow them to create a residential development of some 550 homes on a 130-acre tract in a municipality faced with a serious financial situation due to a rapid increase in similar developments. As stated by Judge Conford in Hilton Acres, supra, at p. 297, "Substantial public interests are at stake and militate for nullification of the excess of agency power here exerted."
Since reliance upon ultra vires acts cannot serve as a basis for gaining vested rights plaintiffs are not entitled to the issuance of building permits or certificates of occupancy and the municipality is not estopped from enforcing the provisions of the amended zoning ordinance.
Judgment will be entered in favor of the defendants on all counts.
Submit an order accordingly.