820 A.2d 122

TOLL BROS., INC., AND MARTIN RESNICK, PLAINTIFFS–RE-SPONDENTS, v. THE PLANNING BOARD OF THE TOWN-SHIP OF POHATCONG, DEFENDANT–APPELLANT.

Superior Court of New Jersey
Appellate Division

Argued March 26, 2003—Decided April 17, 2003.

---

[4] *D'Sa v. Playhut, Inc.,* 85 *Cal.App.*4th 927, 102 *Cal.Rptr.*2d 495 (2000) is not persuasive authority. The employment agreement in that case contained a very broad covenant not to compete partially if not wholly within the prohibitory provisions of a state statute, *Cal. Bus. & Prof.Code* § 16600, barring covenants not to compete. *D'Sa, supra,* 102 *Cal.Rptr.*2d at 498–99. This State does not have a similar legislative declaration of public policy.

Before Judges CONLEY, NEWMAN and CARCHMAN.

*Kevin P. Benbrook* argued the cause for appellant (*Benbrook & Benbrook,* attorneys; *Mr. Kevin P. Benbrook,* on the brief).

*Carl S. Bisgaier* argued the cause for respondents (*Flaster Greenberg,* attorneys for respondent *Toll Bros., Inc., Raymond R. & David W. Trombadore,* attorneys for respondent *Martin Resnick; Mr. Bisgaier and David R. Oberlander,* on the joint brief).

The opinion of the court was delivered by

CONLEY, P.J.A.D.

Defendant Planning Board of Pohatcong (Board) appeals an order entered in plaintiff developers'[1] in lieu of prerogative writs

---

[1] Martin Resnick is the owner of the property at issue and filed the subdivision applications which have generated this appeal. Toll Bros., Inc., is the contract purchaser of the property. Their interests are identical and we refer to both throughout this opinion as "plaintiffs".

litigation directing the Board to hear their final subdivision application and render a decision thereon.  We affirm.

In June 1993 a 122 single-family home preliminary major subdivision approval was granted for plaintiffs' 84–acre parcel in Pohatcong.  Three one-year extensions permitted by the Municipal Land Use Law, *N.J.S.A.* 40:55D–49d, for protection from new zoning changes were granted by the Board.  A fourth extension was denied.  As a result, the statutory protective period expired June 27, 2000.  On June 6, 2000, the Township of Pohatcong amended its zoning ordinance.  The amendment substantially affected the subject property in that, whereas the old ordinance permitted minimum lot size of 10,800 square feet with cluster development, the new ordinance requires five-acre minimum lots.

However, on April 21, 2000, and thus prior to the expiration of the protective period, an application for final subdivision approval was submitted to the Board.  The Township Engineer deemed the application incomplete as a result of which the time period within which the Board must hear and decide the matter or have the application deemed approved did not begin to run.  *See N.J.S.A.* 40:55D–10.3; *N.J.S.A.* 40:55D–50.  Plaintiffs disagreed.  The record reveals no Board action on the application or any resolutions in connection therewith.  Rather, what seems to have occurred is that prior to an adjourned date for a hearing on the matter, and after the Board had denied the fourth extension of the preliminary subdivision approval (for which there is a resolution), the Board's attorney advised plaintiffs of his opinion that the new zoning provisions applied to the development, that a variance pursuant to *N.J.S.A.* 40A:55–70d from the new lot size requirement was required,[2] and that the Board, therefore, had no jurisdiction to consider the final subdivision application.

---

[2] As far as we can tell, the primary deviation under the new ordinance is lot size.  Lot size deviation requires a dimensional variance cognizable under subsection c which planning boards have jurisdiction to grant.  *N.J.S.A.* 40A:55–70c.  *See Commercial Realty & Resources Corp. v. First Atlantic Props. Co.*, 122 *N.J.* 546, 557, 565, 585 A.2d 928 (1991).

Plaintiffs filed their complaint in lieu of prerogative writs raising several issues, including the Board's nonaction on the final subdivision application and seeking an order directing the Board to hear the application. On plaintiffs' motion for summary judgment on that issue, the motion judge remanded the matter to the Board, directing it "to hear, consider and render a decision on [the] application for final major subdivision approval...."

On appeal, the Board argues:

POINT I THE MUNICIPAL LAND USE LAW DOES NOT EXTEND THE PERIOD OF PROTECTION FROM ZONING CHANGES AFFORDED A PRELIMINARY MAJOR SUBDIVISION APPROVAL UPON THE MERE FILING OF AN APPLICATION FOR FINAL APPROVAL.

POINT II ASSUMING THAT A SUBMISSION PURSUANT TO SUBSECTION B OF *N.J.S.A.* 40:55D–49 ACTS TO EXTEND THE PERIOD OF PROTECTION GRANTED IN SUBSECTION A OF THAT STATUTE, THE SUBMISSION MUST BE IN THE FORM OF AN APPLICATION THAT IS DEEMED COMPLETE PRIOR TO THE EXPIRATION OF THE PERIOD OF PROTECTION AFFORDED THE PRELIMINARY APPROVAL.

POINT III PLAINTIFFS' FAILURE TO SATISFY CONDITIONS PRECEDENT OF THE PRELIMINARY APPROVAL FORECLOSED THE RIGHT TO MAKE APPLICATION FOR FINAL APPROVAL.

We reject as a proper subject of this appeal the Board's contention in point III that plaintiffs' "failure to satisfy conditions precedent to the preliminary approval" precluded a final subdivision application. This was not the basis for the Board's inaction on the final subdivision application, neither was it the basis for the motion judge's decision.[3] As to the legal contentions in points I and II, we disagree, as did the motion judge.

---

[3] As observed in plaintiffs' appellate brief:

It must be emphasized the trial court's Order does not in any manner foreclose the Planning Board from raising issues of completeness or consistency with the Preliminary Approval. The Planning Board is free to raise such issues at the hearing on the Final Application which will now be conducted, if the Order of the trial court is upheld. At that hearing, a full record on those issues can be created, and any Planning Board determination would in turn be subject to review by the courts based upon that record.

In remanding plaintiff's final subdivision application to the Board and directing that it exert jurisdiction and render a decision, Judge Harry K. Seybolt said:

This is a motion to reverse the decision of the Planning Board in refusing to hear the final application for a major subdivision. The statute 40:55D–49 applies. I interpret subsection b, which specifically says that the applicant may submit for final approval on or before the expiration date of the preliminary approval the whole or a section or sections of the preliminary subdivision plat or site plan as the case may be. I interpret that as meaning that it can apply to the whole and that so that the submission for final approval, and the word "submit" is used for final approval, must be made before the expiration of the preliminary. The preliminary can be extended either under subsection d or in subsection c.

In the case before the court it was extended under both and the Section 50 of the Land Use Law 40:55D–50 provides for final approval of site plan and major subdivisions and it provides that the Planning Board shall grant final approval if the detailed drawings, specifications and estimates of the application for final approval conform to the standards established by ordinance for final approval, the conditions of the preliminary approval and, in the case of major subdivision, the standards prescribed by the Map Filing Law.

And then so there is a process for final approval. It isn't a process as far as I interpret it that everything has to be complete at the time that the submission is made. The submission, as far as I interpret it and the cases that have been decided under it, that as long as the submission is made within the period of time of the preliminary, the three-year preliminary approval time, plus any extensions at that time granted by the Planning Board. I don't believe that the Planning Board is under an obligation to grant any extensions. If they wish to amend their ordinance they don't have to grant the extension and they can act, they would have the jurisdiction to act after, they can amend their ordinance and that amendment will take affect on anyone whose application and any extensions that preliminary approval have expired. Preliminary approval is intended to give a landowner or a potential developer the right to rely on the terms and conditions established at the time of preliminary approval.

What we have here in the many pages of conditions set forth in the Cherry, Weber and Associates review, a number of items listed as incomplete. I went through a number of them before we got into oral argument, or at least during Mr. Bisgaier's presentation, that these are all conditions that must be fulfilled before the Planning Board grants final approval. And you don't get final approval until that's granted. It always says that final approval shall be granted or denied within 45 days after submission of a complete application. Obviously, it doesn't say that the complete application has to be, it has to be complete at the time that there is a submission. And it doesn't say that in subsection b.

I find that there was a submission for final approval by—by Mr. Resnick or on behalf of Mr. Resnick by someone who wants to develop the property, namely Toll Brothers, Inc., within the period of time of the three-year period, plus the extensions granted by the Board. And, therefore, they now can proceed under the

final approval process under the same zoning regulations that were in effect at the time the preliminary approval was granted. And they are not compelled to comply with the changes in the zoning under the terms of the Land Use Law. That does not mean, as I suggested in my discussion with Mr. Bisgaier, that they can start now and ten years from now continue to get a completed application. They must act with some due diligence.

Although not necessarily the product of clear draftsmanship, we agree that *N.J.S.A.* 40:55D–49 confers protection from zoning changes upon plaintiffs' final subdivision application submission. The statute provides in full:

Preliminary approval of a major subdivision pursuant to section 36 of *P.L.* 1975, c. 291 (*C.* 40:55D–48) or of a site plan pursuant to section 34 of *P.L.* 1975, c. 291 (*C.* 40:55D–46) shall, except as provided in subsection d. of this section, confer upon the applicant the following rights for a 3–year period from the date on which the resolution of preliminary approval is adopted:

a. That the general terms and conditions on which preliminary approval was granted shall not be changed, including but not limited to use requirements; layout and design standards for streets, curbs and sidewalks; lot size; yard dimensions and off-tract improvements; and, in the case of a site plan, any requirements peculiar to site plan approval pursuant to section 29.3 of *P.L.* 1975, c. 291 (*C.* 40:55D–41); except that nothing herein shall be construed to prevent the municipality from modifying by ordinance such general terms and conditions of preliminary approval as relate to public health and safety;

b. That the applicant may submit for final approval on or before the expiration date of preliminary approval the whole or a section or sections of the preliminary subdivision plat or site plan, as the case may be; and

c. That the applicant may apply for and the planning board may grant extensions on such preliminary approval for additional periods of at least 1 year but not to exceed a total extension of 2 years, provided that if the design standards have been revised by ordinance, such revised standards may govern.

d. In the case of a subdivision of or site plan for an area of 50 acres or more, the planning board may grant the rights referred to in subsections a., b., and c. of this section for such period of time, longer than 3 years, as shall be determined by the planning board to be reasonable taking into consideration (1) the number of dwelling units and nonresidential floor area permissible under preliminary approval, (2) economic conditions, and (3) the comprehensiveness of the development. The applicant may apply for thereafter and the planning board may thereafter grant an extension to preliminary approval for such additional period of time as shall be determined by the planning board to be reasonable taking into consideration (1) the number of dwelling units and nonresidential floor area permissible under preliminary approval, and (2) the potential number of dwelling units and nonresidential floor area of the section or sections awaiting final approval, (3) economic conditions and (4) the comprehen-

siveness of the development; provided that if the design standards have been revised, such revised standards may govern.

e. Whenever the planning board grants an extension of preliminary approval pursuant to subsection c. or d. of this section and preliminary approval has expired before the date on which the extension is granted, the extension shall begin on what would otherwise be the expiration date. The developer may apply for the extension either before or after what would otherwise be the expiration date.

f. The planning board shall grant an extension of preliminary approval for a period determined by the board but not exceeding one year from what would otherwise be the expiration date, if the developer proves to the reasonable satisfaction of the board that the developer was barred or prevented, directly or indirectly, from proceeding with the development because of delays in obtaining legally required approvals from other governmental entities and that the developer applied promptly for and diligently pursued the required approvals. A developer shall apply for the extension before (1) what would otherwise be the expiration date of preliminary approval or (2) the 91st day after the developer receives the last legally required approval from other governmental entities, whichever occurs later. An extension granted pursuant to this subsection shall not preclude the planning board from granting an extension pursuant to subsection c. or d. of this section.

[*N.J.S.A.* 40:55D–49.]

It has been said that the purpose of this statute "is to give a developer a reasonable period of protection from changes in the zoning law." *Palatine I v. Planning Bd. of Tp. of Montville*, 133 *N.J.* 546, 553, 628 *A.*2d 321 (1993); *Hilton Acres v. Klein*, 64 *N.J.Super.* 281, 292, 165 *A.*2d 819 (App.Div.1960), *modified on other grounds*, 35 *N.J.* 570, 174 *A.*2d 465 (1961) ("The ... immunity is fairly to be construed as intended to afford reasonable assurances to developers of that scope that they may safely make the kind of investment thus envisaged ... without [the] risk of major or substantial disturbance of their plans by the local authorities...."); *Bleznak v. Township of Evesham*, 170 *N.J.Super.* 216, 219, 406 *A.*2d 201 (Law Div.1979).

That purpose is expressly set forth in subsection a. Subsections c, d, e and f provide for additional extensions of the protective period without expressly repeating the protective language of subsection a that "the general terms and conditions on which preliminary approval was granted shall not be changed...." *N.J.S.A.* 40:55D–49a. But clearly that is the purpose of the

extensions authorized under subsections c, d, e and f. Subsection b, too, does not repeat the protective provisions set forth in subsection a. But there is no reason to think the Legislature would have intended otherwise. Why else was the applicant authorized under *N.J.S.A.* 40:55D–49 to submit a final application during the protective period other than to obtain the benefit of that protection?

We reject the Board's contention that subsection b does nothing more than authorize a developer to obtain partial final approval. First, subsection b expressly refers to submission of a final application for the "whole" of the project, as well as "a section or sections." *N.J.S.A.* 40:55D–49b. Second, the entire object of *N.J.S.A.* 40:55D–49 is to provide for a period of protection from zoning changes. The Board has provided us with no legislative history to even suggest that subsection b was added to the statute to accomplish an entirely distinct and unrelated objective.

To be sure, there is a separate statutory protective period that attaches to a final subdivision application approval. *N.J.S.A.* 40:55D–52. Indeed, in recognition of the possibility of sectional approval, that statute expressly states that: "Notwithstanding any other provisions of this act, the granting of final approval terminates the time period of preliminary approval pursuant to [*N.J.S.A.* 40:55D–49] for the section granted final approval." *N.J.S.A.* 40:55D–52a.

But *N.J.S.A.* 40:55D–52 does not address the protection that may adhere to a final subdivision application that has been submitted, albeit not approved, during the preliminary subdivision protection period. We are convinced that is what *N.J.S.A.* 40:55D–49b addresses.

Both plaintiffs and defendant point to *Palatine I v. Planning Bd. of Tp. of Montville, supra,* 133 *N.J.* 546, 628 *A.*2d 321, as instructive. *Palatine* involved site-plan approval not subdivision approval. But the statutory provisions are comparable. There, plaintiff had received preliminary site-plan approval for a building in February 1982. The statutory protection period, with several

extensions, expired on February 11, 1987. Part of the building was completed during the protective period. A zoning change enacted in 1986 affected the remainder of the project if not statutorily protected. An application for final site-plan approval was not submitted to the Planning Board until October 1989, after the expiration of the preliminary approval protective period. The Planning Board denied final site-plan approval, concluding that the new zoning restrictions applied. Noting that plaintiff had not "submitted" final site-plan approval prior to the expiration of the preliminary approval protective period, the Court held that the property "was no longer protected by the preliminary site-plan approval from changes in the applicable zoning laws." *Id.* at 554, 628 *A.*2d 321. And, in rejecting plaintiff's equitable estoppel contention, the Court observed: "Palatine's interests in a stable regulatory environment were amply protected by the [statutory] period of protection it received under the preliminary site-plan approval.... It chose not to *apply* for final site-plan approval, which would have given it another [period of statutory protection], during [that time]." *Id.* at 562, 628 *A.*2d 321 (emphasis added).

Here, the Board asserted that the Court's reasoning in *Palatine* allows the Board, in this case, to decline jurisdiction over plaintiffs' final subdivision application because, as of the date of expiration of the preliminary approval protection period, plaintiffs had not obtained final subdivision approval and so, like Palatine, they too must operate under the new zoning requirements. However, this argument is flawed. First, the statute does not use the term "obtain" final approval. It authorizes an applicant to "submit" a final approval application. *N.J.S.A.* 40:55D–49b. Second, in *Palatine*, plaintiff did not submit his final approval application until long after the protection afforded the preliminary approval had expired. *Palatine I v. Planning Bd. of Tp. of Montville, supra,* 133 *N.J.* at 554, 628 *A.*2d 321. Here, the final subdivision approval was submitted two months prior to the expiration of the preliminary approval.

We reject the Board's contention that the final subdivision application must be "complete" to trigger protection under subsection b. The statute does not so require. We presume the Legislature was aware of the completeness concept when it enacted *N.J.S.A.* 40:55D–49b. *Brewer v. Porch*, 53 *N.J.* 167, 174, 249 *A.*2d 388 (1969). *See N.J.S.A.* 40:55D–10.3; *N.J.S.A.* 40:55D–50. We assume *N.J.S.A.* 40:55D–49b intentionally does not specify that the submission be that of a completed final subdivision application. The reason is not difficult to discern as the practicalities are that rarely is the initial final subdivision application in a state of completeness. The Legislature certainly understood this as reflected by *N.J.S.A.* 40:55D–10.3.[4]

We recognize some mischief could occur from this construction of the protective provisions of the MLUL and acknowledge the Board's concern over a "sham" final subdivision application sub-

---

[4] *N.J.S.A.* 40:55D–10.3 provides:

An application for development shall be complete for purposes of commencing the applicable time period for action by a municipal agency, when so certified by the municipal agency or its authorized committee or designee. In the event that the agency, committee or designee does not certify the application to be complete within 45 days of the date of its submission, the application shall be deemed complete upon the expiration of the 45-day period for purposes of commencing the applicable time period, unless: a. the application lacks information indicated on a checklist adopted by ordinance and provided to the applicant; and b. the municipal agency or its authorized committee or designee has notified the applicant, in writing, of the deficiencies in the application within 45 days of submission of the application. The applicant may request that one or more of the submission requirements be waived, in which event the agency or its authorized committee shall grant or deny the request within 45 days. Nothing herein shall be construed as diminishing the applicant's obligation to prove in the application process that he is entitled to approval of the application. The municipal agency may subsequently require correction of any information found to be in error and submission of additional information not specified in the ordinance or any revisions in the accompanying documents, as are reasonably necessary to make an informed decision as to whether the requirements necessary for approval of the application for development have been met. The application shall not be deemed incomplete for lack of any such additional information or any revisions in the accompanying documents so required by the municipal agency.

mitted only to avoid zoning changes. But this is not what occurred here. It is true that plaintiffs have taken a great deal of time to develop their property. The development, however, has been stalled by difficulties in obtaining sanitary sewer approvals, despite persistent efforts to obtain the necessary approvals.[5] These difficulties apparently were not resolved until early 2000. Moreover, when the Board's engineer characterized their application as incomplete, plaintiffs disagreed and urged the Board to hear and decide the application. This is hardly indicative of delaying tactics. Further, as Judge Seybolt observed:

> I'll deal with in a subsequent application, if the Board feels that you are dragging your feet and not proceeding because certainly you have used the statutory time period for the three-year period plus the extensions. And the submission I do not find is—it's not simply we're here. Obviously, there were a number of things that we[re] reviewed and deemed complete in the Cherry, Weber Associates' review, but on those that are incomplete, some can be diligently obtained and some may take a little bit of time and I'll deal with any application on the part of the Board if they feel that you are not acting with due diligence.

Affirmed.

---

[5] One of the preliminary subdivision approval conditions was a requirement that the sanitary sewerage from the subdivision be treated by the Phillipsburg Sewer Treatment Plant. During the July 31, 2000, hearing on plaintiffs' fourth extension application, plaintiffs explained to the Board that they had started to apply for 39,000 gallons of sewer capacity from the Phillipsburg Sewer Treatment Plant in 1989. The plant was not responsive and the Mayor of Alpha "got into the picture and said ... that Alpha would sell capacity to [the development] since Phillipsburg was not responding to our requests." The Mayor of Alpha agreed to service the development's sewerage needs in July 1998. However, at a public hearing in April of 1999, the Alpha Planning Board rejected this agreement. Plaintiffs sued Alpha; Alpha sought to settle—"Alpha ... said we will sell you the gallonage but we need more land, 160,000. We need $250,000."' This was accepted and effectuated by a July 11, 2000, agreement.